David A. Berstein (State Bar No. 204472)
J. R. Dimuzio (State Bar No. 299803)
BERSTEIN LAW, PC
4000 MacArthur Boulevard, Suite 600 East Tower
Newport Beach, California 92660
T:  949.783.4210
E-mail: *david@bersteinlaw.com; jr@bersteinlaw.com*

Attorneys for Plaintiffs MMAS Research, LLC and Dr. Donald E. Morisky

# IN THE UNITED STATES DISTRICT COURT

## FOR THE CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION

| | |
|---|---|
| MMAS RESEARCH, LLC, a Washington Limited Liability Company; and DR. DONALD E. MORISKY, an individual,<br><br>        Plaintiffs,<br><br>v.<br><br>THE REGENTS OF THE UNIVERSITY OF CALIFORNIA, a California corporation, and DOES 1 through 10, inclusive,<br><br>        Defendants. | Case No.<br><br>**COMPLAINT FOR DAMAGES:**<br><br>1. **Copyright Infringement Under 17 U.S.C. §101, *et seq.***<br><br>2. **False Designation of Origin/Federal Unfair Competition Under 15 U.S.C. § 1125(a)**<br><br>3. **Violation of California Business & Professions Code §§ 17200, *et seq.***<br><br>**JURY TRIAL DEMANDED** |

BERSTEIN LAW, PC
4000 MACARTHUR BOULEVARD, SUITE 600 EAST TOWER
NEWPORT BEACH, CALIFORNIA 92660

Plaintiffs MMAS Research, LLC and Dr. Donald Morisky complain and allege as follows:

## **PARTIES**

1.      Plaintiff MMAS Research, LLC ("MMAS Research") is a Washington, LLC in good standing which conducts business in the Central District of California.

2.      Plaintiff Dr. Donald Morisky ("Morisky") is an individual and principal of Plaintiff MMAS Research.   Plaintiff Morisky, a *Professor Emeritus* at the University of California, Los Angeles, conducts business primarily within the jurisdiction of this Court.

3.      Plaintiffs MMAS Research and Morisky shall collectively be referred to herein as "Plaintiffs."

4.      Defendant The Regents of the University of California ("Defendants" or "THE REGENTS") is a California public corporation, authorized and empowered to administer a public trust known as the University of California, pursuant to Article IX, Section 9, subdivisions (a) and (f) of the California Constitution. Its principal place of business is in Oakland, Alameda County, California.

5.      The University of California, San Francisco and the University of California, San Francisco Medical Center are each subsumed entities of THE REGENTS.

6.      The true names and capacities of Defendants DOES 1 through 10, inclusive, whether individual, corporate, associate, or otherwise, are unknown to Plaintiff, who therefore sues such Defendants by such fictitious names.

7.      Plaintiffs are informed, believe, and thereon allege that said DOES 1 through 10, inclusive, are officers, employees, and/or agents of the other Defendants and/or the alter-ego of the Defendants and were acting in that capacity at all relevant times.

8.      Plaintiffs will seek leave of this Court to amend this Complaint to show the true names and capacities of DOES 1 through 10, inclusive, when same have been ascertained.

9.      Plaintiffs are informed, believe, and thereon allege that each of the Defendants named herein as DOES 1 through 10, inclusive, were and are in some manner responsible for the actions, acts, and omissions herein alleged, and for the damage caused by the

Defendants and are, therefore, jointly and severally liable for the damage caused to Plaintiffs.

10.     Plaintiffs are informed, believe, and thereon allege that each of the Defendants, including DOES 1 through 10, inclusive were, at all times herein relevant, acting in concert with and in conspiracy with each and every one of the remaining Defendants. Plaintiffs will amend this Complaint to allege the true names and capacities of such DOES, together with such allegations as are appropriate, when same are ascertained.

11.     Each Defendant is sued both as principal and as the servant, agent, employee, co-venturer, and co-tortfeasor of the remaining Defendants, and each of them is liable in some manner for the damages to Plaintiffs complained of herein.

12.     Plaintiffs are informed, believe, and thereon allege Defendants, and each of them, did at all material times foresee the nature and extent of the probable consequences of their acts in proximately causing said damages to Plaintiffs, and acted within the course and scope of such service, agency, employment, and joint venture, and with the knowledge, permission, and authority, actual and apparent, express and implied, direct and vicarious, of the remaining Defendants, and each of them.

13.     At all times, each Defendant was either an individual, corporation, partnership, association, group, or entity, doing business or carrying on business in this District.

14.     Wherever appearing in this Complaint, each and every reference to Defendants or to any of them, is intended to be and shall be a reference to all Defendants hereto, and to each of them named and unnamed, including all fictitiously named Defendants, unless said reference is otherwise specifically qualified.

15.     Plaintiffs are informed, believe, and thereon allege that at all relevant times each of the Defendants was the agent, employee, representative, co-conspirator, affiliate, alter-ego, and/or successor-in-interest of each of them, and of each other, and has, in such capacity or capacities, participated in the acts or conduct alleged herein. All allegations made herein shall apply to both the Defendants and to unnamed DOE Defendants, as applicable.

BERSTEIN LAW, PC
4000 MACARTHUR BOULEVARD, SUITE 600 EAST TOWER
NEWPORT BEACH, CALIFORNIA 92660

**JURISDICTION AND VENUE**

16.     This action arises under the Copyright Act of 1976, 17 U.S.C. §§101 *et. seq.*, and the Lanham Trademark Act of 1946, 15 U.S.C. § 1051, *et seq.*, conferring Federal question jurisdiction under 28 U.S.C. § 1331, and supplemental jurisdiction on Plaintiffs' state law claims under 28 U.S.C. § 1367.

17.     Venue is proper in this District pursuant to 28 U.S.C. §§1391(b)(2) as: (a) a substantial part of the events or omissions giving rise to Plaintiffs' claims occurred in this District; (b) Defendants conduct business in this District; (c) the unlawful acts of Defendants complained of herein have been committed within and/or have had or will have had an effect in this District; and (f) Plaintiffs, who conduct their business in this District, have been and will continue to be damaged by Defendants' unlawful acts.

## GENERAL ALLEGATIONS

**MORISKY MEDICATION ADHERENCE SCALES**

18.     As early as 2002, Plaintiff Morisky, a *Professor Emeritus* at UCLA, independently developed a distinctive diagnostic tool which determines a patient's adherence to his or her prescribed medication. The tool is known as the Morisky Medication Adherence Scale ("MMAS").

19.     The MMAS measures a person/patient's adherence to their prescribed medication, and the results lead to specific diagnosis, medication reconciliation, and interventions to optimize treatment, as well as form the basis for conclusions/assertions in scientific papers, all covering a wide variety of chronic and infectious diseases and medical conditions. The MMAS is most commonly administered electronically in questionnaire form by individuals/entities who are licensees of Plaintiffs.

20.     The MMAS is currently utilized in two (2) forms, the MMAS-4 (consisting of 4 specifically-tailored questions) and the MMAS-8 (consisting of 8 specifically-tailored questions).

21.     The MMAS-4 is a measure of medication-taking behavior, also referred to as compliance, adherence, and concordance. It is used as a screening tool for non-adherence

BERSTEIN LAW, PC
4000 MACARTHUR BOULEVARD, SUITE 600 EAST TOWER
NEWPORT BEACH, CALIFORNIA 92660

to the medical recommendations of the health care provider. The MMAS-4 is intended to be integrated into the patient's health care visit when the physician informally asks the 4 questions and provides immediate feedback to the patient.  This "teachable moment" is one of the most important aspects of potential behavioral change as counseling and reinforcement over time has shown significant improvement of adherence over time.

22.    The MMAS-8 is a diagnostic adherence assessment instrument which contains a total of eight items measuring two dimensions of non-adherence, namely intentional and unintentional non-adherence.  Furthermore, the MMAS-8 is more than a number defining the magnitude of non-adherence as it also tells the physician "WHY" the patient is non-adherent.

23.    The MMAS-8 is the only diagnostic adherence assessment instrument in the scientific literature that has one of the highest measures of reliability (stability of the measure over time) and validity. It has been validated in over 80 different languages in the world using many levels of validation.

## COPYRIGHTS

24.    In an effort to protect the integrity of the MMAS-4 and protect against counterfeit, infringing, and/or unauthorized use, Plaintiff Morisky filed for and obtained a Certificate of Registration for the "Morisky Medication Adherence Scale (4-item)" ("Morisky MMAS-4 Copyright") (Registration No. TX0008285390, Registration date June 12, 2016) which is comprised of the text of the MMAS-4 test.

25.    In an effort to protect the integrity of the MMAS-8 and protect against counterfeit, infringing, and/or unauthorized use, Plaintiff Morisky filed for and obtained a Certificate of Registration for the "Morisky Medication Adherence Scale (8-item)" ("Morisky MMAS-8 Copyright") (Registration No. TX0008632533, Registration date September 21, 2018) which is comprised of the text of the MMAS-8 test.

26.    As used herein, the Morisky MMAS-4 Copyright and Morisky MMAS-8 Copyright, when used collectively, are referred to as the MORISKY COPYRIGHTS.

27.    Plaintiff Morisky has complied in all respects with the Copyright Act of 1976, 17 U.S.C. §101 *et. seq.* and all other laws governing copyrights as to the MORISKY COPYRIGHTS.

28.    Since the MORISKY COPYRIGHTS were created, Plaintiff Morisky has been, and still is, the sole author and exclusive holder of all rights, title, and interest in and to the copyrights to the MORISKY COPYRIGHTS.  Plaintiff MORISKY has not granted any license or right to any person or entity, including Defendants, to use the MORISKY COPYRIGHTS except solely in association with the authorized use of the Morisky Medication Adherence Scales (MMAS-4 and/or MMAS-8).

29.    The MORISKY COPYRIGHTS are vital to Plaintiffs' ongoing business and profession and, more specifically, Plaintiffs' efforts to ensure that third party use of the Morisky Medication Adherence Scales (MMAS-4 and/or MMAS-8) are authorized and utilized in compliance with Plaintiffs' strict scoring and coding which are maintained by Plaintiffs as trade secrets.

## TRADEMARKS

30.    Plaintiffs are also the creators and owners of the trademarks "Morisky Medication Adherence Scale," "MMAS," "MMAS-4," MMAS-8," and "Morisky Widget" (hereinafter "the MORISKY MARKS").

31.    The "MMAS" trademark is the subject of Federal Trademark Application Serial No. 87775045 and has been used in commerce since at least as early as February 2006.

32.    The "MORISKY WIDGET" trademark is the subject of Federal Trademark Application Serial No. 87775097 and has been used in commerce since at least as early as January 2017.

33.    As a result of the extensive, exclusive, and continued use of the MORISKY MARKS in commerce, medical institutions through, among others, their physicians, nurses, researchers, clinicians, and/or medical students have come to recognize and identify the MORISKY MARKS exclusively with the medication adherence scales

developed by Plaintiff Morisky.  The MORISKY MARKS have become a valuable asset of Plaintiffs as well as a symbol of their goodwill and positive reputations.

## LICENSES

34.    It is of critical importance the integrity of the MMAS be maintained. This is why a strict licensing regimen is used and disclosure of scoring and coding criteria, and translations not provided by Plaintiffs, are not permitted.

35.    Plaintiffs have discovered that when someone obtains the MMAS scoring and coding criteria they often make changes that lead to erroneous results. Others obtaining the MMAS from counterfeiters often make further unauthorized revisions, further increasing the risk of harm to patients and misleading healthcare providers. Unlicensed translations are often divulged and used with the scoring and coding criteria which render the results invalid and misunderstood.

36.    Plaintiffs have spent considerable time and money to develop, maintain, and advance the MMAS described herein and it now can be administered with regard to 110 medical conditions and thousands of specific medications as of this filing, and in more than 80 languages. The MMAS is used by physicians, hospitals, clinicians, pharmaceutical companies, universities, medical researchers, and health ministries throughout the world, including National Institute of Health funded studies, all to measure medication adherence and identify the reasons for why patients do not take their prescribed medications. MMAS translations are provided by Plaintiffs for a small fee along with a translation certification. Translations of the MMAS without proper authorization are prohibited.

37.    The various MMAS diagnostic assessments are validated and translated in over 80 languages and utilized throughout the world. The MMAS is famous in the industry and is the number one patient-centered diagnostic medication adherence assessment of its kind. Plaintiffs make considerable efforts to maintain the secrecy of the scoring and coding of the scale and expressly forbid the disclosure of scoring and coding in their license agreements with licensees of all versions of the MMAS.

38.     Plaintiffs permit the use of the MORISKY COPYRIGHTS, MORISKY MARKS, and the MMAS only through a licensing program memorialized in a licensing agreement. This ensures uniformity of use in scoring and coding, as well as provides much needed support from Plaintiffs.  Modifications of the MMAS, and disclosure of scoring and coding criteria and linguistically certified translations are not permitted.

39.     Reasonable efforts are taken by Plaintiffs to protect and not to disseminate the MMAS or Translated Versions to non-authorized users, as well as the scoring and coding. These restrictions not only protect patients and health care providers from counterfeit diagnostic assessments and inaccurate scoring and coding, but also protect the economic interests of Plaintiffs in the MORISKY COPYRIGHTS, MORISKY MARKS, the MMAS itself along with the diagnostic assessment as they receive licensing fees and are paid per test administered, unless such fees are waived. In fact, the license agreement expressly provides that scoring and coding may not be disclosed.

40.     Licenses are typically provided at no cost for federally-funded studies, and to educational institutions that are not receiving funding for the research/study for which the MMAS is to be used. Others are charged a fee for a fixed term or for a perpetual license sold as the "Morisky Widget."  Plaintiffs also charge fees for training and certification in use of the Morisky Widget, and there is a charge for each test administered by a licensee, in addition to those included in the cost of the license.

41.     The MORISKY COPYRIGHTS, MORISKY MARKS, and the MMAS have been cited in over 8,000 academic journals throughout the world.

42.     Due to Plaintiffs' exclusive and extensive use, through a strict regimen of licensing and supervision, the MORISKY COPYRIGHTS, MORISKY MARKS, and the MMAS have enormous value both economically and for the promotion of health and proper diagnosis of persons suffering from a wide range of chronic and infectious diseases and mental health conditions worldwide.

/ / /

/ / /

## DEFENDANT'S INFRINGING CONDUCT

43.     Plaintiffs are informed and believe on or about November 22, 2011, Plaintiffs entered into an agreement with Linda G. Park, a PhD student at the University of California, San Francisco, for the use of the MORISKY COPYRIGHTS, MORISKY MARKS, and the MMAS.

44.     Pursuant to the terms of the November 22, 2011 agreement, referred to above, Ms. Park, as agent and/or employee of the University of California, San Francisco, obtained a license to the MORISKY COPYRIGHTS, MORISKY MARKS, and the MMAS for one (1) year or the duration of her study, whichever was shorter.

45.     Plaintiffs are informed and believe, Ms. Park's recruitment of participants for her study took place between April 2012 and March 2013.

46.     After that time, Ms. Park administered as part of her study the Morisky Medication Adherence Scale (MMAS-8), in violation of her terms of use of the agreement entered into on November 22, 2011.

47.     Additionally, in or about 2014, a study was published based on Ms. Park's research entitled "*A text messaging intervention to promote medication adherence for patients with coronary heart disease: A randomized controlled trial*," in which there exists multiple infringements of the MORISKY COPYRIGHTS, MORISKY MARKS, and the MMAS.  Attached hereto as **Exhibit "A"** is a true and correct copy of the published 2014 Study.

48.     Further, in or about August 21, 2015, Ms. Selena Z. Kuo, as agent and/or employee of the University of California, San Francisco, entered into an agreement with Plaintiffs for the use of the MORISKY COPYRIGHTS, MORISKY MARKS, and the MMAS for the duration of her study or one (1) year, whichever was shorter.

49.     Plaintiffs are informed and believe, Ms. Kuo's recruitment of participation for her study took place between April 2015 and November 2015.

/ / /

/ / /

COMPLAINT FOR DAMAGES

50.   Plaintiffs are informed and believe, Ms. Kuo administered, as part of her study, the Morisky Medication Adherence Scale (MMAS-8), in violation of her terms of use of the agreement entered into on August 21, 2015.

51.   On August 14, 2016, a study was published in Digestive Diseases & Sciences, Volume 61, Number 12 entitled "Factors Associated with Medication Non-adherence in Patients with End-Stage Liver Disease" (Published online 2016 Dec 8. doi: [10.1007/s10620-016-4391-z]), (Dig Dis Sci. 2017 Feb; 62(2): 543–549) (hereinafter the "2016 Study.  Attached hereto as **Exhibit "B"** is a true and correct copy of the published 2016 Study.

52.   The 2016 Study was conducted by and its publication was co-authored by Selena Z. Kuo, BS, Marta Haftek, MPH, and Jennifer C. Lai, MD, MBA all acting as agents and/or employees for the University of California, San Francisco – a subsumed entity of Defendant THE REGENTS.

53.   On July 18, 2017, a study was published in JMIR Research Protocols (https://www.researchprotocols.org/2017/7/e134) entitled "*Comparing Mobile Health Strategies to Improve Medication Adherence for Veterans With Coronary Heart Disease (Mobile4Meds): Protocol for a Mixed-Methods Study*," Clinical Trial Registration No. NCT03022669 (hereinafter the "2017 Study"). Attached hereto as **Exhibit "C"** is a true and correct copy of the published 2017 Study.

54.   The 2017 Study was conducted by and its publication was co-authored by Linda G. Park, RN, PhD, FNP, Janet K. Shim, PhD, and Mary A. Whooley, MD all acting as agents and/or employees for the University of California, San Francisco – a subsumed entity of Defendant THE REGENTS.

55.   During the course of the 2016 Study and the 2017 Study, the aforementioned individuals and/or those at their direction or on their behalf administered the MMAS-8 and published the results in the 2016 Study and the 2017 Study utilizing the Morisky MMAS-8 Copyright and the "Morisky Medication Adherence Scale" and "MMAS-8" trademarks without a valid license to do so.

56. To date, Defendant THE REGENTS has refused to cooperate with Plaintiffs in an attempt to identify whether the results published by the 2 studies are valid or obtained through counterfeit, inaccurate tests, and/or scoring. Further, Defendant THE REGENTS has flippantly refused to cooperate in obtaining a retroactive, corrective license, training, and certification in the proper use and scoring of the MMAS-8 diagnostic tool which, along with its coding, are maintained as Plaintiffs' trade secret.

## FIRST CAUSE OF ACTION

## FOR MMAS-8 COPYRIGHT INFRINGEMENT (17 U.S.C. § 101, *et seq.*)

## BY PLAINTIFF DR. MORISKY AGAINST ALL DEFENDANTS

57. Plaintiff Morisky alleges and reincorporates by reference each and every allegation contained in paragraphs 1 through 56 as though fully set forth herein.

58. At all times relevant hereto, Plaintiff Morisky has been the owner of all copyright rights or rights to assert copyright claims for the Morisky MMAS-8 Copyright and all derivative works. Plaintiff Morisky has complied in all respects with the Copyright Act of 1976, 17 U.S.C. § 101 *et seq.*, and all other laws governing copyright.

59. Plaintiff Morisky is informed and believes and thereon alleges that Defendants without authorization, have infringed and will continue to infringe the Morisky MMAS-8 Copyright by using, copying, counterfeiting, distributing, or otherwise exploiting same without a license to do so.

60. By means of the actions complained of herein, Defendants, and each of them, have infringed, and will continue to infringe, the Morisky MMAS-8 Copyright.

61. Plaintiff Morisky is entitled to an injunction restraining Defendants, and each of them, and all persons acting in concert with them, from engaging in further such acts in violation of the copyright laws.

62. As a direct result of Defendants' infringement, Plaintiff Morisky has sustained damages in an amount to be determined at trial.

/ / /

/ / /

COMPLAINT FOR DAMAGES

BERSTEIN LAW, PC
4000 MACARTHUR BOULEVARD, SUITE 600 EAST TOWER
NEWPORT BEACH, CALIFORNIA 92660

63.     Pursuant to 17 U.S.C. §§ 502, 503, 504, and 505, Plaintiff Morisky is entitled to an award of actual or statutory damages, injunctive relief, the impoundment and destruction of the infringing materials, and his attorneys' fees and costs.

64.     Plaintiff Morisky is also entitled to damages, pursuant to the Copyright Act of 1976, 17 U.S.C. §§ 101, *et. seq.*, for Defendants' willful and continued infringement of the Morisky MMAS-8 Copyright.

## SECOND CAUSE OF ACTION

## FALSE DESIGNATION OF ORIGIN/FEDERAL UNFAIR COMPETITION UNDER 15 U.S.C. § 1125(a)

## BY PLAINTIFFS AGAINST ALL DEFENDANTS

65.     Plaintiffs reallege each and every allegation set forth in Paragraphs 1 through 64, inclusive, and incorporates them by reference herein.

66.     As herein alleged, Defendants' unauthorized use of the "Morisky Medication Adherence Scale" and "MMAS-8" trademarks in connection with the publications of the 2016 Study and 2017 Study constitutes unfair competition and false designation of origin in violation of Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a), because Defendants' use of the marks suggests a false designation of the origin of the unauthorized MMAS-8 diagnostic tests used, identified, and published. Further, such acts of infringement by Defendants further suggests a false association with Plaintiffs and/or that Plaintiffs approved of or authorized the use of the unauthorized MMAS-8 diagnostic tests used, identified, and published by Defendants.

67.     As a direct and legal result Defendants' unauthorized use of the "Morisky Medication Adherence Scale" and "MMAS-8" trademarks, Defendants have damaged and will continue to damage Plaintiffs and Plaintiffs' goodwill and reputation; and have caused and are likely to continue to cause a loss of profits for Plaintiffs. Defendants' actions have caused and will continue to cause irreparable harm to Plaintiffs and to the public, who is confused by Defendants' unauthorized use of the "Morisky Medication Adherence Scale" and "MMAS-8" trademarks, unless restrained and enjoined by this

Court. Plaintiffs have no adequate remedy at law to prevent Defendants from continuing their infringing actions and from injuring Plaintiffs.

68.    As a further direct and legal result of Defendants' actions, Plaintiffs have been damaged and will continue to sustain damage and are entitled to receive compensation arising from Plaintiffs' lost profits and efforts necessary to minimize and/or prevent customer and consumer confusion, in an amount to be proven at the time of Trial. In addition, Plaintiffs are entitled to disgorge Defendants' profits, and are entitled to interest and to their attorney's fees and costs in bringing this action, all in an amount to be proven at the time of Trial. Plaintiffs are further entitled to injunctive relief as set forth above, and to all other and further forms of relief this Court deems appropriate.

## **THIRD CAUSE OF ACTION**

### **UNFAIR COMPETITION [B&P §17200, *et seq.*]**

### **BY PLAINTIFFS AGAINST ALL DEFENDANTS**

69.    Plaintiffs realleges paragraphs 1 through 68 of the complaint and incorporate them by this reference as though fully set forth herein.

70.    Defendants have committed all of the aforesaid acts willfully, maliciously and oppressively, without regard to Plaintiffs' legal, contractual, and exclusive proprietary rights.

71.    Defendants' acts and practices as detailed above constitute acts of unlawful, unfair or fraudulent business acts and practices within the meaning of California Business and Professions Code §17200.

72.    Pursuant to California Business and Professions Code §17203, Plaintiffs seek an order from this Court prohibiting defendants from engaging or continuing to engage in the unlawful, unfair, or fraudulent business acts or practices set forth herein.

/ / /

/ / /

/ / /

/ / /

BERSTEIN LAW, PC
4000 MACARTHUR BOULEVARD, SUITE 600 EAST TOWER
NEWPORT BEACH, CALIFORNIA 92660

73.    Plaintiffs additionally requests an order from this Court requiring that Defendants disgorge profits and return or pay to Plaintiffs all of Defendants' profits from the illegal transactions described herein, and/or pay restitution, including the amount of money that would have been paid to Plaintiffs for the sales or tests contemplated and consummated by Defendants as a result of the acts described herein, including through the use of Plaintiffs' assets, trade secrets, copyrights, and trademarks.

74.    Plaintiffs further request an order by this Court that Defendants are the trustee of all sums received by them that rightfully belong to Plaintiffs and to impose a constructive trust on said sums directing defendants to hold said sums for the benefit of Plaintiffs.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray that this Court enter judgment in their favor and against Defendants as follows:

### ON THE FIRST CAUSE OF ACTION
### (Copyright Infringement)

1.    That Defendants each be held to have infringed Plaintiff Morisky's MMAS-8 Copyright;

2.    That Defendants, their directors, officers, agents, servants, employees, and all other persons in active concert or privity or in participation with them, be enjoined from directly or indirectly infringing Plaintiff Morisky's MMAS-8 Copyright;

3.    That Defendants, their directors, officers, agents, servants, employees, and all other persons in active concert or privity or in participation with them, be enjoined to return to Plaintiff any originals, copies, facsimiles, reproductions or duplicates of the MMAS-8 Copyright in their possession, custody, or control;

4.    That Defendants each be enjoined to deliver upon oath, to be impounded during the pendency of this action, and for destruction pursuant to judgment herein, all originals, copies, facsimiles, reproductions or duplicates of any work shown by the evidence to infringe any of Plaintiff Morisky's MMAS-8 Copyright;

COMPLAINT FOR DAMAGES

5.    That Defendants each be required to file with the Court and to serve on Plaintiff, within 30 days after service of the Court's order as herein prayed, a report in writing under oath setting forth in detail the manner and form in which Defendants each complied with the Court's order;

6.    That judgment be entered for Plaintiff Morisky and against Defendants, for Plaintiff's actual damages according to proof, and for any additional profits attributable to infringements of Plaintiff Morisky's MMAS-8 Copyright, in accordance with proof;

7.    That judgment be entered for Plaintiff and against Defendants, for damages based upon Defendants' willful acts of infringement, pursuant to the Copyright Act of 1976, 17 U.S.C. §§ 101, *et. seq.*;

8.    That Defendants each be required to account for all gains, profits, and advantages derived from their acts of infringement and for their other violations of law;

9.    That all gains, profits, and advantages derived by Defendants of their acts of infringement and other violations of law be deemed to be in constructive trust for the benefit of Plaintiff;

10.    That, to the extent that any infringement occurred subsequent to the registration of the MMAS-8 Copyright, that Plaintiff be awarded statutory damages;

11.    That Plaintiff be awarded prejudgment interest at the legal rate pursuant to California Civil Code § 3336;

12.    That Plaintiff be awarded exemplary/punitive damages;

13.    That Plaintiff be awarded attorneys' fees and costs of suit; and

14.    Such other and further relief at law or in equity, to which the Court deems just and proper.

## ON THE SECOND CAUSE OF ACTION

### (Trademark Infringement)

15.    That it be found that Plaintiffs' "Morisky Medication Adherence Scale" and "MMAS-8" trademarks have been infringed by Defendants' acts under 15 U.S.C. § 1125;

16.    That it be found that Defendants, and each of them, have unfairly competed with

BERSTEIN LAW, PC
4000 MACARTHUR BOULEVARD, SUITE 600 EAST TOWER
NEWPORT BEACH, CALIFORNIA 92660

Plaintiffs in violation of 15 U.S.C. § 1125 and <u>California Business and Professions Code</u> §§ 17200, *et seq.*;

17.    That it be found that Plaintiffs are entitled to recover damages from Defendants, and each of them, for their acts of trademark infringement and unfair competition and that Plaintiffs be awarded their reasonable attorneys' fees;

18.    That it be found that Plaintiffs are entitled to recover damages from Defendants, and each of them, for Defendants' acts of unfair competition and unjust enrichment, and that Plaintiffs further recover punitive damages under California law because Defendants' acts have been willful, fraudulent, oppressive, and/or malicious;

19.    That Defendants, and each of them, their officers, shareholders, directors, agents, servants, employees, attorneys, parent companies, confederates, and all persons in active concert or participation with them now and in the future, be enjoined from:

    a.    Using any combination, reproduction, counterfeit, copy, or colorable imitation of the MORISKY TRADEMARKS in connection with the use of the Morisky Medication Adherence Scale or likely to injure Plaintiffs' business, reputation or the reputation of the MORISKY TRADEMARKS;

    b.    Using any combination, reproduction, counterfeit, copy or colorable imitation of the MORISKY TRADEMARKS in any manner likely to cause confusion, to cause mistake, or to deceive the public;

    c.    Selling, offering to sell, advertising, promoting, or passing off, inducing, or enabling others to sell, offer to sell, advertise, promote, or pass off any diagnostic tools similar to those provided by Plaintiff under a name or mark the same as or similar to Plaintiffs' MORISKY TRADEMARKS;

    d.    Committing any acts calculated to cause customers or consumers to believe that Defendants' studies, research, research results, and/or publications are approved, licensed, sponsored by, or endorsed by Plaintiffs; and

    e.    Otherwise competing unfairly with Plaintiffs in any manner, including, but not limited to, infringing usage of Plaintiff's MORISKY TRADEMARKS,

or any confusingly similar marks.

20.     That Defendants, and each of them, be required to deliver up to Plaintiff for destruction, any and all materials which infringe Plaintiffs' MORISKY TRADEMARKS in Defendants' possession or under their control;

21.     That Defendants be required to deliver up to Plaintiff for destruction, any and all publications, study results, and other printed material in Defendants' possession or under its control displaying or exploiting Plaintiffs' MORISKY TRADEMARKS;

22.     That Defendants be ordered pursuant to 15 U.S.C. § 1116(a) to file, with the Court and serve upon Plaintiff, within thirty (30) days of the entry of injunction prayed for herein, a written report, under oath or affirmed under penalty of perjury, setting forth in detail the form and manner in which it has complied with the ordered permanent injunction; and

23.     Such other and further relief at law or in equity, to which the Court deems just and proper.

**ON THE THIRD CAUSE OF ACTION**

**(Unfair Competition in Violation of**

**<u>California Business & Professions</u> Code § 17200)**

24.     For an order enjoining Defendants from engaging in acts which are unlawful, fraudulent, unfair, and deceptive within the meaning of <u>California Business & Professions</u> Code § 17200;

25.     For an order that Defendants restore to the general public all funds acquired through their infringing activities which are unlawful, fraudulent, unfair, and deceptive within the meaning of <u>California Business & Professions Code</u> § 17200;

26.     Attorneys' fees and costs of suit incurred herein pursuant to <u>California Code of Civil Procedure</u> §1021.5;

27.     For an award of compensatory damages according to proof at the time of trial; and

/ / /

/ / /

BERSTEIN LAW, PC
4000 MACARTHUR BOULEVARD, SUITE 600 EAST TOWER
NEWPORT BEACH, CALIFORNIA 92660

28.    Such other and further relief at law or in equity, to which the Court deems just and proper.

Date: November 20, 2018                    BERSTEIN LAW, PC

                                           By: _____
                                                David A. Berstein
                                                J. R. Dimuzio
                                                Attorneys for Plaintiffs MMAS Research, LLC
                                                and Dr. Donald E. Morisky

## <u>DEMAND FOR A TRIAL BY JURY</u>

        Plaintiffs hereby demand a trial by jury on all Causes of Action in the Complaint so triable.

Date: November 20, 2018                    BERSTEIN LAW, PC

                                           By:   David A. Berstein
                                                J. R. Dimuzio
                                                Attorneys for Plaintiffs MMAS Research, LLC
                                                and Dr. Donald E. Morisky

BERSTEIN LAW, PC
4000 MACARTHUR BOULEVARD, SUITE 600 EAST TOWER
NEWPORT BEACH, CALIFORNIA 92660

# EXHIBIT A

Case 2:18-cv-09767          Document 1      Filed 11/20/18     Page 20 of 36      Page ID #:20

| PubMed | ▼ | |

---

**Format**: Abstract ⌄

**Full text links**



Patient Educ Couns. 2014 Feb;94(2):261-8. doi: 10.1016/j.pec.2013.10.027. Epub 2013 Nov 18.

# A text messaging intervention to promote medication adherence for patients with coronary heart disease: a randomized controlled trial.

Park LG[1], Howie-Esquivel J[2], Chung ML[3], Dracup K[2].

⊕ **Author information**

## Abstract

**OBJECTIVE:** Pharmacologic treatment for secondary prevention of coronary heart disease (CHD) is critical to prevent adverse clinical outcomes. In a randomized controlled trial, we compared antiplatelet and statin adherence among patients with CHD who received: (1) text messages (TM) for medication reminders and education, (2) educational TM only, or (3) No TM.

**METHODS:** A mobile health intervention delivered customized TM for 30 days. We assessed and analyzed medication adherence with electronic monitoring devices [Medication Event Monitoring System (MEMS)] by one-way ANOVA and Welch tests, two-way TM response rates by t-tests, and self-reported adherence (Morisky Medication Adherence Scale) by Repeated Measures ANOVA.

**RESULTS:** Among 90 patients (76% male, mean age 59.2 years), MEMS revealed patients who received TM for antiplatelets had a higher percentage of correct doses taken (p=0.02), percentage number of doses taken (p=0.01), and percentage of prescribed doses taken on schedule (p=0.01). TM response rates were higher for

antiplatelets than statins (p=0.005). Self-reported adherence revealed no significant differences among groups.

**CONCLUSION:** TM increased adherence to antiplatelet therapy demonstrated by MEMS and TM responses.

**PRACTICE IMPLICATIONS:** Feasibility and high satisfaction were established. Mobile health interventions show promise in promoting medication adherence.

Published by Elsevier Ireland Ltd.

**KEYWORDS:** Antiplatelets; Coronary heart disease; Medication adherence; Mobile phone; Statins; Text messaging

PMID: 24321403   DOI: 10.1016/j.pec.2013.10.027

[Indexed for MEDLINE]

  

## Publication types, MeSH terms, Substances

**Publication types**

Randomized Controlled Trial

Research Support, Non-U.S. Gov't

**MeSH terms**

Adult

Aged

Aged, 80 and over

Analysis of Variance

Case 2:18-cv-09767 Document 1 Filed 11/20/18 Page 22 of 36 Page ID #:22

Cell Phone

Coronary Disease/drug therapy*

Female

Humans

Hydroxymethylglutaryl-CoA Reductase Inhibitors/therapeutic use*

Male

Medication Adherence*

Middle Aged

Patient Satisfaction

Platelet Aggregation Inhibitors/therapeutic use*

Prospective Studies

Reminder Systems*

Text Messaging*

## Substances

Hydroxymethylglutaryl-CoA Reductase Inhibitors

Platelet Aggregation Inhibitors

## LinkOut - more resources



# EXHIBIT B

# *Factors Associated with Medication Non-adherence in Patients with End-Stage Liver Disease*

## Selena Z. Kuo, Marta Haftek & Jennifer C. Lai

**Digestive Diseases and Sciences**

ISSN 0163-2116

Dig Dis Sci
DOI 10.1007/s10620-016-4391-z





**Your article is protected by copyright and all rights are held exclusively by Springer Science +Business Media New York. This e-offprint is for personal use only and shall not be self-archived in electronic repositories. If you wish to self-archive your article, please use the accepted manuscript version for posting on your own website. You may further deposit the accepted manuscript version in any repository, provided it is only made publicly available 12 months after official publication or later and provided acknowledgement is given to the original source of publication and a link is inserted to the published article on Springer's website. The link must be accompanied by the following text: "The final publication is available at link.springer.com".**



Author's personal copy

Dig Dis Sci
DOI 10.1007/s10620-016-4391-z



**ORIGINAL ARTICLE**

# Factors Associated with Medication Non-adherence in Patients with End-Stage Liver Disease

Selena Z. Kuo[1] · Marta Haftek[1] · Jennifer C. Lai[1]

Received: 14 August 2016 / Accepted: 22 November 2016
© Springer Science+Business Media New York 2016

**Abstract**

*Background* Low medication adherence is known to contribute to worse health outcomes in the general population.

*Aim* We aimed to evaluate the medication regimen and determine the adherence levels among patients with end-stage liver disease.

*Methods* We measured adherence in patients awaiting liver transplantation at a single center using the 8-item Morisky Medication Adherence Scale (MMAS-8), with a score <8 classified as low adherence. Medication regimen complexity was assessed using the Medication Regimen Complexity Index (MRCI) tool. Factors associated with low adherence were identified by logistic regression.

*Results* Of 181 patients, 33% were female, median age was 62, and model for end-stage liver disease (MELD) score was 13. The median (IQR) number of medications was 10 (7–13), and the MRCI was 19 (13–27). In total, 54 (30%) were high adherers, and 127 (70%) were low adherers. In total, 42% reported sometimes forgetting to take their medication and 22% reported intermittent adherence within the past 2 weeks. The most common reasons for low adherence were: forgetfulness (27%) and side effects (14%). Compared to high adherence, low adherence was associated with higher number of medications, medication complexity, and diabetes, but lower rates of hepatocellular carcinoma and self-perceived health. In univariable logistic regression, total medication number (OR 1.08), MRCI (OR 1.04), diabetes (OR 2.38), HCC (OR 0.38), and lower self-perceived health (OR 1.37), were statistically significant factors associated with non-adherence. In multivariate analysis, only medication number without supplements (OR 1.14) remained significantly associated with medication non-adherence.

*Conclusion* A majority of patients awaiting liver transplantation demonstrated low medication adherence. Total number of medications and regimen complexity were strong correlates of low adherence. Our data underscores the need for chronic liver disease management programs to improve medication adherence in this vulnerable population.

**Keywords** Medication adherence · Liver transplantation · End-stage liver disease · MMAS-8 · Medication complexity regimen index

**Electronic supplementary material** The online version of this article (doi:10.1007/s10620-016-4391-z) contains supplementary material, which is available to authorized users.

✉ Jennifer C. Lai
    Jennifer.lai@ucsf.edu

    Selena Z. Kuo
    Selena.kuo@ucsf.edu

    Marta Haftek
    Marta.haftek@gmail.com

1   Division of Gastroenterology/Hepatology, Department of Medicine, University of California, San Francisco, 513 Parnassus Ave, Med Sci, San Francisco, CA 94143, USA

## Introduction

Poor adherence to medication regimens adversely impacts health outcomes in many chronic conditions. In the USA, up to 69% of all medication-related hospital admissions are due to medication non-adherence alone [1, 2]. In the context of transplant, poor adherence to immunosuppressive therapy is considered one of the leading causes of preventable graft failure; it is estimated to be involved in 20% of late acute rejection episodes and 16% of graft losses [3].

Published online: 08 December 2016



Author's personal copy

Dig Dis Sci

Specifically, in liver transplant recipients, the mean self-reported non-adherence was 14%, whereas 32% were shown to be non-adherent to medications based on tacrolimus levels [4]. While the data on medication adherence in organ transplantation is mainly focused on the post-transplant period, there is a clear paucity of studies in the pre-transplant period [3–6].

Since poor adherence to medication can be modifiable, it is critical to understand the predictors and risk factors of non-adherence in the transplant setting—particularly given that pre-transplant non-adherence may impact post-transplant outcomes [7]. This is even more important to address in the pre-transplant setting given that the MRCI of transplant-specific medications in liver transplant patients is 18 with an average of 8.5 medications [5]. Therefore, in this study, we aimed to assess medication adherence in patients with end-stage liver disease awaiting liver transplantation with the intent of identifying modifiable factors associated with medication non-adherence.

## Methods

### Study Population

Included were consecutive adult ($\geq$18 years), English-speaking patients with end-stage liver disease listed for liver transplantation who presented for an outpatient clinical visit to the UCSF Liver Transplant Clinics between April 2015 and November 2015. Patients at any Child–Pugh score and MELD score were eligible to enroll. Excluded were patients with severe hepatic encephalopathy, defined by the time to complete the numbers connection test of >120 s, as we felt that severe hepatic encephalopathy would impair a patient's ability to complete the study procedures [8].

### Study Procedures and Data Collection

All patients in this study filled out the Morisky Medication Adherence Scale (MMAS), an instrument widely used to measure medication adherence for a variety of chronic diseases and was initially validated in patients with hypertension [9]. The MMAS contains eight self-reported items with seven yes or no questions, and one question answered on a 5-point Likert scale ($\alpha$-reliability = 0.83). Each "no" answer yields one point; any score <8 points is classified as "low adherence," as there is no room for medication error with transplant patients on the waitlist.

Each patient's medication regimen was obtained by electronic health record review on the date of assessment. Medication reconciliation is a required part of every outpatient, and it is performed twice, first by the medical

assistant and then by the clinician. Drugs were categorized according to the Anatomical Therapeutic Chemical Classification System (ATC code) [10]. Medication complexity was assessed using the Medication Regimen Complexity Index (MRCI) tool [11]. The MRCI score incorporates the number of medications, dosage frequency, dosage forms, and administration instructions. There are no upper or lower limits for the MRCI scale. For reference, the MRCIs of patients with HIV, diabetes mellitus, and hypertension have scores of 22, 23, and 18, respectively [12]. Topicals, shampoos, and natural substances were not included in the analyses.

Patient demographics including medical comorbidities, ascites, insurance status, marital status, and laboratory studies within 3 months of the study visit were collected from the patient's electronic health record.

At the same visit, we asked patients the following question derived from the National Health Interview Study [13] to rate their general health status:

> Would you say your health in general is excellent (0), very good (1), good (2), fair (3), poor (4), or very poor (5)?

### Statistical Analysis

Patients were classified as highly adherent if they scored 8 on the MMAS-8 and low adherers if they scored <8. Differences in baseline characteristics by medication adherence status were analyzed using Chi-square or Wilcoxon rank-sum tests for categorical and continuous variables, respectively. Univariable logistic regression was performed to determine which factors were associated with low medication adherence. Multivariable logistic regression was performed with inclusion of all factors statistically associated with low medication adherence in univariate analysis. A cutoff $p$ value <0.05 was used to determine statistical significance.

Stata® v11 (College Station, Texas) was used for all statistical analyses.

## Results

### Baseline Demographics of the Cohort

Baseline characteristics of the 181 patients with end-stage liver disease awaiting liver transplantation are presented in column A of Table 1. The median (IQR) age was 62 (56–65), 33% were female, 57% were non-Hispanic white, 48% had chronic HCV, 36% had HCC, and 21% had a caregiver that was not themselves. With respect to medical comorbidities, 48% had hypertension, 28% had diabetes,



Dig Dis Sci

**Table 1** Baseline characteristics of 181 patients with end-stage liver disease awaiting liver transplantation

| Characteristics | All<br>n = 181 | High adherence (8)<br>n = 54 (30%) | Non-adherence (<8)<br>n = 127 (70%) | p value |
|---|---|---|---|---|
| Age, years | 62 (56–65) | 62 (56–65) | 61 (56–64) | 0.59 |
| % Female | 33% | 28% | 35% | 0.37 |
| % White | 57% | 61% | 55% | 0.51 |
| BMI | 29.6 (25.9–32.4) | 28.9 (25.2–32.7) | 29.7 (25.9–32.4) | 0.65 |
| *Etiology of liver disease* | | | | 0.66 |
| HCV | 48% | 48% | 48% | |
| Alcohol | 20% | 24% | 19% | |
| Other | 31% | 28% | 33% | |
| HCC | 36% | 52% | 29% | 0.004 |
| *Medical comorbidities* | | | | |
| Hypertension | 48% | 43% | 50% | 0.39 |
| Diabetes | 28% | 17% | 32% | 0.03 |
| Coronary artery disease | 6% | 0% | 9% | 0.03 |
| Married | 64% | 61% | 65% | 0.58 |
| Primary caregiver that is not self | 21% | 15% | 24% | 0.18 |
| *Insurance* | | | | 0.2 |
| Medicare | 18% | 11% | 21% | |
| Private insurance | 71% | 80% | 67% | |
| Medi-Cal insurance plan | 11% | 9% | 12% | |
| *Self-assessment* | | | | 0.001 |
| Excellent/very good | 24% | 15% | 21% | |
| Good | 36% | 58% | 28% | |
| Fair | 29% | 13% | 35% | |
| Poor/very poor | 11% | 7% | 8% | |
| Laboratory MELD | 13 (10–17) | 13 (10–17) | 14 (11–17) | 0.41 |
| Ascites | 24% | 19% | 25% | 0.38 |
| Numbers connection test, seconds | 36 (28–48) | 34 (25–49) | 39 (28–48) | 0.22 |
| *Child-Pugh score* | | | | |
| A | 38% | 41% | 36% | 0.78 |
| B | 46% | 45% | 47% | |
| C | 16% | 14% | 17% | |
| Total number of medications | 10 (7–13) | 8 (6–12) | 10 (7–13) | 0.01 |
| Number of medications | 7 (5–10) | 6.5 (4–9) | 8 (5–10) | 0.008 |
| Number of supplements | 2 (1–3) | 2 (1–3) | 2 (1–3) | 0.9 |
| MRCI | 19 (13–27) | 17 (9–24) | 20 (14–28) | 0.02 |
| Anti-infectives | 66% | 61% | 68% | 0.4 |
| Blood and blood-forming organs | 28% | 15% | 34% | 0.009 |
| Genitourinary | 12% | 13% | 12% | 0.8 |
| Musculoskeletal | 30% | 24% | 32% | 0.3 |
| Nervous system | 36% | 30% | 39% | 0.2 |
| Respiratory system | 30% | 26% | 32% | 0.4 |
| Cardiovascular system | 31% | 26% | 34% | 0.3 |
| GI and metabolism | 90% | 87% | 91% | 0.4 |
| Systemic hormones | 15% | 13% | 17% | 0.5 |
| Liver-related medications | 90% | 83% | 92% | 0.08 |



Author's personal copy

Dig Dis Sci

and 6% had coronary artery disease. The median (IQR) MELD score was 13 (10–17), and the proportion with Child-Pugh score A, B, and C was 38, 46, and 16%, respectively.

## Medication Regimen of Patients with End-Stage Liver Disease

The median (IQR) number of total medications per patient (including supplements) was 10 (7–13). Not including supplements, the median number of medications per patient was 7 (5–10). The median MRCI of the total medications for each patient was 19 (13–27). For reference, the MRCIs of patients diagnosed with HIV, diabetes mellitus, and hypertension, have mean MRCI scores of 22, 23, and 18, respectively [12].

The patient cohort had a total of 1800 unique medications; 395 (22%) were over-the-counter supplements (Supplemental Table 1). The most commonly prescribed medications were related to the gastrointestinal tract and metabolism (30%)—primarily proton-pump inhibitors (6%). Liver-related medications were the second most commonly prescribed, which included loop diuretics (6%), osmotic laxatives (5%), and potassium-sparing diuretics (5%). Of the supplements, vitamins accounted for 12% of the total medications.

## Assessment of Medication Adherence

Based on the MMAS-8 survey, 54 (30%) patients were classified as highly adherent and 127 (70%) patients as low adherers. Overall, 42% of patients reported that they "sometimes forget to take their medication" and 28% of the patients reported that "there were times I did not take my medications in the past two weeks" (Table 2).

## Baseline Characteristic Differences Associated with Medication Non-adherence

Median MELD scores and Child-Pugh scores were similar between patients with low versus high medication adherence, but rates of HCC were lower in patients with low adherence (29 vs. 52%; $p = 0.004$) (Table 1). Patients with low versus high adherence had higher rates of diabetes (32 vs. 17%; $p = 0.03$) despite similar medication complexity by MRCI score (18 vs. 20; $p = 0.09$).

The low adherence group had a median of 10 medications per patient (IQR 7–13) compared to the high adherence group, which had eight medications (6–12; $p = 0.01$). Both groups had a median of two supplements. After adjusting for supplements, there was still a statistically significant difference in medication number in the low adherence group compared to the high adherence group (8 vs. 6.5; $p = 0.008$). Compared to patients reporting high medication adherence, patients with low adherence had a higher medication complexity by MRCI score (20 vs. 17, $p = 0.02$). Patients with low adherence also reported significantly lower self-reported health (58 vs. 28% reported "good" and 13 vs. 35% reported "fair"; $p = 0.001$). There was no association between the percent of patients on medications of different classes.

**Table 2** The 8-item Morisky Adherence Questions

| Questions | % of Yes |
|---|---|
| 1. Do you sometimes forget to take your medicine? | 42% |
| 2. People sometimes miss taking their medicines for reasons other than forgetting. Thinking over the past two weeks, were there any days when you did not take your medicine? | 28% |
| 3. Have you ever cut back or stopped taking your medicine without telling your doctor because you felt worse when you took it? | 15% |
| 4. When you travel or leave home, do you sometimes forget to bring along your medicine? | 17% |
| 5. Were there any medications you did not take yesterday? | 12% |
| 6. When you feel like your symptoms are under control, do you sometimes stop taking your medicine? | 11% |
| 7. Taking medicine every day is a real inconvenience for some people. Do you ever feel hassled about sticking to your treatment plan? | 23% |
| 8. How often do you have difficulty remembering to take all your medicine? | 1–72% |
| (1) Never/rarely, (2) once in a while, (3) sometimes, (4) usually, and (5) all the time | 2–22% |
| | 3–4% |
| | 4–1% |
| | 5–1% |

The MMAS-8 was used to determine levels of adherence for each patient. The total percentage of yes answers to each question is reported



Author's personal copy

Dig Dis Sci

| Table 3 Reasons for not taking medications | Reasons for not taking medication | Frequency |
|---|---|---|
| | I feel like my symptoms are under control | 6 (3%) |
| | Side effects | 30 (14%) |
| | Cost of medication or other barriers to obtaining medication | 2 (0.9%) |
| | I do not think the medication is helping control my symptoms | 2 (0.9%) |
| | I forget to take my medication | 57 (27%) |
| | The reason I need to take my medication was not made clear to me | 4 (2%) |
| | *Other reasons* | 56 (27%) |
| | Timing or scheduling issue | 29 (14%) |
| | Too busy with other activities/traveling | 3 (1%) |
| | Does not like the taste or taking the medication | 8 (4%) |
| | Not applicable, always takes medication | 54 (26%) |

Patient-reported reasons for not taking their medication and the frequency of each answer. There were 211 responses, as some patients listed more than one reason, and some of the highly adherent patients did not have a response

### Patient-Reported Reasons for Non-adherence

Of the 181 patients, there were 211 total responses when asked the reason for not taking medication. The most commonly stated reason was "I forget to take my medication" (27%). The second most common reason was "side effects" (14%) (Table 3). There were 109 total responses for the medications least likely to take, and the most common response was lactulose (27%), followed by diuretics (16%), nighttime medications (8%), and all other medications were <6% of the responses.

### Factors Associated with Medication Non-adherence

In univariable logistic regression, MRCI (OR 1.04 95% CI 1.00–1.08; $p = 0.03$), total medication number (OR 1.09 95% CI 1.00–1.07; $p = 0.04$), medication number without supplements (OR 1.14 95% CI 1.03–1.25; $p = 0.009$), diabetes (OR 2.38 95% CI 1.06–5.34; $p = 0.04$), and HCC (OR 0.38 95% CI 0.20–0.74; $p = 0.004$), and lower self-assessment of health status (OR 1.39 95% CI 0.98–1.98; $p = 0.07$) were significantly associated with non-adherence. In multivariable logistic regression, after allowing for all factors associated with medication non-adherence in univariable analysis, only medication number without supplements (OR 1.14 95% CI 1.03–1.25; $p = 0.009$) remained significantly associated with medication non-adherence.

### Discussion

Patients with end-stage liver disease suffer from complications such as ascites, hepatic encephalopathy, and variceal bleeding, on top of their underlying chronic liver disease (e.g., chronic hepatitis B and autoimmune hepatitis). In addition, as the population ages, they are increasingly presenting with multiple comorbidities such as hypertension and diabetes that can be independent of their liver disease but also contribute directly to their liver dysfunction. Management of all of these conditions involves pharmacotherapy, but as these conditions add up, the medication burden for the patient can become seemingly overwhelming.

In this paper, we describe this burden and its consequential effects of medication adherence in patients with end-stage liver disease. We assigned everyone who was not perfectly adherent as "low adherers," because in the transplant setting, there is no room for medication error as patients can quickly develop liver rejection or opportunistic infections. We observed a high rate of medication non-adherence (70%). This is all the more alarming given that our study population consists of a select subgroup of patients who have been listed for liver transplantation for which the perceived ability to adhere to medications *after* transplant is a pre-requisite. On average, a patient in our cohort only waits one year for transplantation, which further highlights the urgency of the situation, as many of these patients were likely non-adherent to their medications close to their transplant date. Even though the MRCI scores of this patient cohort were on par with other chronic diseases, our data demonstrates that a higher medication burden is an associated factor of low adherence. Each unit increase in number of medications was associated with a 14% increase in odds of being non-adherent to medications. Interestingly, liver disease severity, as measured by MELD or Child-Pugh score, was not significantly associated with medication non-adherence in multivariable analysis. Having diabetes was associated with medication non-adherence despite there being no difference in MRCI



Author's personal copy

Dig Dis Sci

scores, indicating that there is a separate component to having diabetes that puts patients at risk of low adherence. Not surprisingly, patients with hepatocellular carcinoma had lower overall MRCIs, which likely explains why patients with HCC have better medication adherence. Lower self-assessments of a patient's general health were also a correlate of low adherence. A lack of insight into one's own illness has been recognized as a barrier to drug adherence, and it is possible that the patients who report a lower self-perceived health status have a more negative outlook and belief about their disease state. However, it is also possible that patients feel worse due to a lack of control of their symptoms from their poor adherence. Regardless, the patient's self-assessment can serve as a quick identifier of patients at risk of non-adherence.

Our study also provides a detailed evaluation of the medication regimens of patients with end-stage liver disease. This population of patients has medication regimens that span a wide range of categories, with a degree of complexity (e.g., frequency and route of administration) that is comparable to other chronic diseases such as HIV and diabetes patients [12]. As with other chronic diseases, end-stage liver disease is hardly a "singular" condition; it is associated with multiple comorbidities (e.g., hyperlipidemia, hypertension, and diabetes) and leads to multiple complications (e.g., ascites, hepatic encephalopathy, and osteoporosis)—all of which involve at least one if not multiple medications for optimal management. It has been shown that many cirrhotics lack the knowledge required to manage their own disease, but simple educational interventions have proven effective, which could potentially translate into better medication adherence [14]. In addition, studies in the liver transplant recipients have shown that higher scores in treatment knowledge and demonstrated regimen use were associated with reductions in post-transplant rehospitalizations [4]. In the kidney transplant setting, limited literacy was associated with non-adherence [6]. Systematic reviews on interventions for chronic conditions have shown that dosage simplification and repeated assessment of medication use with feedback were by far the most effective interventions [15]. The behavioral intervention of three telephone calls to assess adherence, provide feedback, and give recommendations in patients with dyslipidemia, provided the largest effect size [16]. It is imperative that novel strategies that combine dosage simplification, such as development of single-pill combinations, and educational interventions tailored to patients with end-stage liver disease are designed and tested in this more acutely sick patient population.

We acknowledge several limitations to our study. The MMAS-8 tool has not previously been tested in a population of patients with end-stage liver disease, but this tool has been validated in several other chronic conditions, including hypertension, diabetes, and epilepsy [9, 17, 18]. It relies on self-report to assess adherence, rather than pharmacy records; however, a prior study has shown strong correlation with MMAS-8 scores and pharmacy refill adherence for antihypertensive medications in patients with hypertension [19]. Given our relatively small sample size, effects that were not statistically significant may still be important factors of non-adherence. Furthermore, the sample size limited our ability to correlate non-adherence with clinical outcomes, which will be critical to assess in future studies. We only collected overall adherence to the medication regimen as a whole and were unable to assess adherence levels to specific medications or medication categories. Though our limited sample size could have resulted in underpowering, it is the largest study to date that investigates adherence in patients awaiting transplant. Patients with severe hepatic encephalopathy were excluded from the study, but they only account for 2% of the patient cohort, which is unlikely to have a large effect on the data analysis. Patients in this cohort were from a single center, and only patients proficient or fluent in English were included in the study, which may limit generalizability to non-English-speaking patients. Both medication regimens and medication adherence levels are independently dynamic throughout a patient's life, and we only assessed medication adherence at a single time point. Despite this, our study still identified alarmingly high rates of low adherence, and our data collection of potential factors was done at the same time point that the MMAS-8 tool was administered.

In conclusion, patients with end-stage liver disease awaiting liver transplantation display low medication adherence predominantly related to the total burden of medication regimens. Given that medication adherence *prior to* transplant is strongly associated with medication adherence *after* transplant [7], we advocate for the development and implementation of pre-transplant chronic disease management programs that include structured medication support. Future research should also focus on clinical outcomes, such as hospitalizations or decompensations, which may directly result from medication non-adherence. Our work serves as strong justification for future research to develop novel strategies to enhance medication adherence in this vulnerable patient population.

**Compliance with ethical standards**

**Conflicts of interest** None to disclose.

# References

1. Osterberg L, Blaschke T. Adherence to medication. *N Engl J Med*. 2005;353:487–497.
2. Senst BL, Achusim LE, Genest RP, et al. Practical approach to determining costs and frequency of adverse drug events in a

Author's personal copy

Dig Dis Sci

health care network. *Am J Health Syst Pharm*. 2001;58: 1126–1132.

3. Denhaerynck K, Dobbels F, Cleemput I, et al. Prevalence, consequences, and determinants of nonadherence in adult renal transplant patients: a literature review. *Transpl Int*. 2005;18: 1121–1133.

4. Serper M, Patzer RE, Reese PP, et al. Medication misuse, nonadherence, and clinical outcomes among liver transplant recipients. *Liver Transpl*. 2015;21:22–28.

5. Kamila P, Smith SG, Patzer R, Wolf MS, Marina S. Medication regimen complexity in kidney and liver transplant recipients. *Transplantation*. 2014;98:e73–e74.

6. Patzer RE, Serper M, Reese PP, et al. Medication understanding, non-adherence, and clinical outcomes among adult kidney transplant recipients. *Clin Transplant*. 2016;30:1294–1305.

7. Dobbels F, Vanhaecke J, Dupont L, et al. Pretransplant predictors of posttransplant adherence and clinical outcome: an evidence base for pretransplant psychosocial screening. *Transplantation*. 2009;87:1497–1504.

8. Weissenborn K, Ruckert N, Hecker H, Manns MP. The number connection tests A and B: interindividual variability and use for the assessment of early hepatic encephalopathy. *J Hepatol*. 1998;28:646–653.

9. Morisky DE, Ang A, Krousel-Wood M, Ward HJ. Predictive validity of a medication adherence measure in an outpatient setting. *J Clin Hypertens (Greenwich)*. 2008;10:348–354.

10. Organization WH. Guidelines for ATC classification and DDD assignment. ed.^eds. *Guidelines for ATC classification and DDD assignment*, City; World Health Organization;1996.

11. George J, Phun YT, Bailey MJ, Kong DC, Stewart K. Development and validation of the medication regimen complexity index. *Ann Pharmacother*. 2004;38:1369–1376.

12. Libby AM, Fish DN, Hosokawa PW, et al. Patient-level medication regimen complexity across populations with chronic disease. *Clin Ther*. 2013;35:385–398.

13. McGee DL, Liao Y, Cao G, Cooper RS. Self-reported health status and mortality in a multiethnic US cohort. *Am J Epidemiol*. 1999;149:41–46.

14. Volk ML, Fisher N, Fontana RJ. Patient knowledge about disease self-management in cirrhosis. *Am J Gastroenterol*. 2013;108: 302–305.

15. Kripalani S, Yao X, Haynes RB. Interventions to enhance medication adherence in chronic medical conditions: a systematic review. *Arch Intern Med*. 2007;167:540–550.

16. Marquez Contreras E, Casado MJJ, Corchado AY, et al. Efficacy of an intervention to improve treatment compliance in hyperlipidemias. *Aten Primaria*. 2004;33:443–450.

17. Sakthong P, Chabunthom R, Charoenvisuthiwongs R. Psychometric properties of the Thai version of the 8-item Morisky Medication Adherence Scale in patients with type 2 diabetes. *Ann Pharmacother*. 2009;43:950–957.

18. Sweileh WM, Ihbesheh MS, Jarar IS, et al. Self-reported medication adherence and treatment satisfaction in patients with epilepsy. *Epilepsy Behav*. 2011;21:301–305.

19. Krousel-Wood M, Islam T, Webber LS, Re RN, Morisky DE, Muntner P. New medication adherence scale versus pharmacy fill rates in seniors with hypertension. *Am J Manag Care*. 2009;15:59–66.



# EXHIBIT C

Case 2:18-cv-09787   Document 1   Filed 11/20/18   Page 34 of 36   Page ID #:34



| PubMed | ▼ |  |

---

**Format**: Abstract ⌄

Full text links

 

JMIR Res Protoc. 2017 Jul 18;6(7):e134. doi: 10.2196/resprot.7327.

# Comparing Mobile Health Strategies to Improve Medication Adherence for Veterans With Coronary Heart Disease (Mobile4Meds): Protocol for a Mixed-Methods Study.

Park LG[1], Collins EG[2], Shim JK[3], Whooley MA[4].

⊖ Author information

1   Department of Veterans Affairs, Community Health Systems, University of California, San Francisco, San Francisco, CA, United States.

2   Edward Hines Jr., VA Hospital, Department of Biobehavioral Health Science, University of Illinois at Chicago, Chicago, IL, United States.

3   University of California, San Francisco, Social and Behavioral Sciences, San Francisco, CA, United States.

4   Department of Veterans Affairs, Department of Medicine, Epidemiology and Biostatistics, University of California, San Francisco, San Francisco, CA, United States.

## Abstract

**BACKGROUND:** Adherence to antiplatelet medications is critical to prevent life threatening complications (ie, stent thrombosis) after percutaneous coronary interventions (PCIs), yet rates of nonadherence range from 21-57% by 12 months. Mobile interventions delivered via text messaging or mobile apps represent a practical and inexpensive strategy to promote behavior change and enhance medication adherence.

**OBJECTIVE:**

Case 2:18-cv-09767   Document 1   Filed 11/20/18   Page 35 of 36   Page ID #:35

The Mobile4Meds study seeks to determine whether text messaging or a mobile app, compared with an educational website control provided to all Veterans, can improve adherence to antiplatelet therapy among patients following acute coronary syndrome (ACS) or PCI. The three aims of the study are to: (1) determine preferences for content and frequency of text messaging to promote medication adherence through focus groups; (2) identify the most patient-centered app that promotes adherence, through a content analysis of all commercially available apps for medication adherence and focus groups centered on usability; and (3) compare adherence to antiplatelet medications in Veterans after ACS/PCI via a randomized clinical trial (RCT).

**METHODS:** We will utilize a mixed-methods design that uses focus groups to achieve the first and second aims (N=32). Patients will be followed for 12 months after being randomly assigned to one of three arms: (1) customized text messaging, (2) mobile app, or (3) website-control groups (N=225). Medication adherence will be measured with electronic monitoring devices, pharmacy records, and self-reports.

**RESULTS:** Enrollment for the focus groups is currently in progress. We expect to enroll patients for the RCT in the beginning of 2018.

**CONCLUSIONS:** Determining the efficacy of mobile technology using a Veteran-designed protocol to promote medication adherence will have a significant impact on Veteran health and public health, particularly for individuals with chronic diseases that require strict medication adherence.

**TRIAL REGISTRATION:** ClinicalTrials.gov NCT03022669.

©Linda G Park, Eileen G Collins, Janet K Shim, Mary A Whooley. Originally published in JMIR Research Protocols (http://www.researchprotocols.org), 18.07.2017.

**KEYWORDS:** adherence; cardiovascular disease; medication; mobile application; mobile health; text messaging

PMID: 28720557   PMCID: PMC5539386   DOI: 10.2196/resprot.7327

Case 2:18-cv-09767 Document 1 Filed 11/20/18 Page 36 of 36 Page ID #:36

## Free PMC Article

  

**Images from this publication.** See all images (3) Free text



---

**Secondary source ID, Grant support** 

---

**LinkOut - more resources** 

---